United States District Court
Middle District of Florida
Jacksonville Division

KATHLEEN MATHIS,

     *Plaintiff,*

V.                                    No. 3:16-CV-1386-J-32PDB

CSX CORPORATION SHORT TERM
DISABILITY PLAN,

     *Defendant.*

---

# Report & Recommendation

Kathleen Mathis sues the CSX Corporation Short Term Disability Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, challenging the denial of a claim for benefits for a 36-day period.[1] Before the Court are (1) the Plan's motion for final judgment under Federal Rule of Civil Procedure 52 or summary judgment under Federal Rule of Civil Procedure 56, Doc. 13; (2) Mathis's brief to support the complaint, Doc. 15; (3) the Plan's response in opposition to her brief, Doc. 16; and (4) her response to the Plan's motion, Doc. 17. The parties agree there are no factual issues, the Court should limit its review to the administrative record, the arbitrary-and-capricious standard applies, and the Court should enter judgment for one party or the other without further proceedings.

---

[1] The case was referred to the undersigned under 28 U.S.C. § 636(b) and Local Rule 6.01(b) for a report and recommendation on an appropriate resolution. Doc. 11.

I.     **Administrative Record**[2]

A.     *Overview*

The Plan is a "company funded short[-]term disability plan providing … temporary continuation of [an employee's] salary for a maximum of 26 weeks in the event of a disability that prevents [her] from working." Administrative Record ("AR") 2. The Plan designates CSX Corporation's Vice President of Compensation and Benefits as the Plan administrator, and CSX pays the benefits. AR 18. The Plan designates Metropolitan Life Insurance Company as the claim administrator and provides that MetLife does not insure the benefits. Doc. 1 ¶ 5; AR 2, 6, 18. MetLife administers the Plan "pursuant to the terms of an administrative service agreement" and has "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to the Plan benefits." AR 18, 21.

Under the Plan, "**Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury: You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and You are unable to earn more than 80% of Your Predisability Earnings at Your Own Occupation." AR 6 (emphasis in original). "**Own Occupation** means the essential functions You regularly perform that provide Your primary source of earned income." AR 6 (emphasis in original). "**Sickness** means illness, disease or pregnancy, including complications of pregnancy." AR 8 (emphasis in original). "**Appropriate Care and Treatment** means medical care and treatment … given by a Physician whose

_____

[2]To protect Mathis's privacy, the Court allowed the Plan to file under seal her medical records, which make up most of the administrative record. Doc. 18. The parties have not asked the Court to seal the motion, the brief, the responses, or any court decision.

The Summary Plan Description is at docket entry 13-3. All other parts of the administrative record are under seal at docket entry S-20. Citations to the administrative record use the page numbers in the bottom right corners of the documents.

medical training and clinical specialty are appropriate for treating" the disability; "consistent in type, frequency and duration of treatment with relevant guidelines of national medical research, health care coverage organizations and governmental agencies"; "consistent with a Physician's diagnosis" of the disability; and "intended to maximize … medical and functional improvement." AR 6 (emphasis in original). "**Proof** means Written evidence satisfactory to the Claim Administrator that a person has satisfied the conditions and requirements for [a] benefit." AR 8 (emphasis in original). When an employee submits a claim, proof must establish "the nature and extent of the loss or condition," the Plan's "obligation to pay," and "the claimant's right to receive payment." AR 8.

Under the Plan, an employee must file a claim with MetLife within 45 days of the date she became disabled. AR 19. MetLife must review the claim and notify the employee of its decision. AR 20. If MetLife denies the claim, "the notification of the claims decision will state the reason why [the] claim was denied and reference the specific Plan provision(s) on which the denial is based." AR 20. An employee may appeal a denial, and MetLife must "conduct a full and fair review of [the] claim" by a different decision maker without deference to the initial denial. AR 20. "If the initial denial is based in whole or in part on a medical judgment, [MetLife] will consult with a health care professional with appropriate training and experience in the field of medicine involved in the medical judgment. This health care professional will not have consulted on the initial determination, and will not be a subordinate of any person who was consulted on the initial determination." AR 20–21. If MetLife denies the claim on appeal, it must send a final written decision stating the reasons for the denial. AR 21.

Mathis began working as a software engineer for CSX in 2007 and participated in the Plan.[3] Doc. 1 ¶¶ 4, 5; AR 523–25, 554. The software engineer job is sedentary.

---

[3]CSX states Mathis was terminated for job abandonment on January 6, 2016, Doc. 13 at 5, but provides no record citation for that fact. Whether she was employed by CSX in 2016 is irrelevant to a decision in this case.

AR 660. A software engineer researches, analyzes, and defines business solutions; prepares detailed project specifications; designs solutions for business problems; defines strategic asset management objectives; codes, debugs, tests, and supports utilities, tools, and programs; provides impact analyses for changes to programs and systems; and serves as a technical resource on project teams. AR 526–28. A software engineer may have to travel up to five percent of the time. AR 527. A software engineer's schedule and hours vary. AR 527.

In May 2015, Mathis ceased work and claimed benefits under the Plan. AR 556, 558. MetLife granted the claim for May 7 to June 21 and later extended the period to July 20, then to August 31, and then to September 13. AR 333, 393, 423, 475.

On September 14, 2015, Mathis returned to work, but on September 28, she left work and applied for reinstatement of benefits from September 29 to November 4, 2015—the maximum duration of benefits under the Plan and the period at issue. AR 26, 191–94, 327, 331, 655, 662.

On January 8, 2016, MetLife denied Mathis's claim. AR 133–34. She appealed the denial and submitted more evidence. AR 73, 99, 104, 124. On September 9, 2016, Metlife upheld the initial denial of the claim and informed her she had "exhausted administrative remedies under the Plan" and could sue under ERISA. AR 26–30.

This case followed. Doc. 1.

### B.    *Medical Records, Claim File, and Decisions*

### 1.    *Before the Period at Issue (May 1 to September 28, 2015)*

On May 7, Mathis was admitted to River Point Behavioral Health's "Intensive Outpatient Program." AR 351–52, 485. She sought help with coping and time management. AR 485. A report of a mental status examination detailed normal findings except for a depressed mood and tearful affect. AR 486. The treatment plan

consisted of participating in group therapy for "dealing with ego strengthening and emotional regulation" and attending individual therapy sessions. AR 487. She ceased working and received benefits under the Plan. AR 556, 558. She reported to a MetLife claim manager that depression and anxiety had been "brewing" for a few years and worsening. AR 558.

On May 21, Stephanie Billman, L.M.H.C., with River Point Behavioral Health prepared a "behavioral health evaluation." AR 497–501. Mathis reported feeling overwhelmed, stressed, depressed, and chronically fatigued; sleeping poorly; having suicidal thoughts and difficulty at work; and worrying about the future. AR 498. Mathis appeared fatigued, tearful, sullen, lethargic, irritable, labile, and forgetful. AR 498. Billman diagnosed Mathis with dysthymic disorder. AR 498. Mathis told Billman she did not want to take psychotropic medicine because she had reacted badly to medicine before. AR 500. Billman opined Mathis could not work, checking boxes indicating moderate, moderately severe, and severe functional impairments. AR 500–01.

On May 27, Billman prepared an "attending physician statement." AR 481–84. Billman did not advise Mathis to cease working but opined Mathis could "engage in only limited stress situations and … interpersonal relations" and could not perform job duties because of "stress factors." AR 482–83.

On June 10, Billman prepared a second "behavioral health evaluation" with findings like the first. AR 465–69. Billman stated Mathis "refuses to take psychotropic medications because in the past these medications have had bad side effects." AR 467.

On June 15, Jonathan Gross, Psy.D., with Behavioral Health of North Florida performed a neuropsychological evaluation of Mathis. AR 197–200. She appeared anxious, dysphoric, tangential, and overwhelmed with increased cognitive demand; had intermittent difficulties with comprehension; and exhibited idiosyncratic behaviors ("e.g. eye contact, self-talk, frequent use of expletives"). AR 197. He stated,

5

"Validity scales on self-report measures suggested a tendency to over-report troublesome emotional and impersonal difficulties." AR 197. He diagnosed her with Asperger's disorder, ADHD, social anxiety disorder, panic disorder, persistent depressive disorder, and PTSD. AR 199. He recommended individual psychotherapy; group psychological therapy; consultation with a psychiatrist for psychopharmacological management and consideration of medication; vocational counseling; continued participation in activities that promote talents and strengths; familiarization with Asperger's disorder; and participation in organizations for individuals with Asperger's disorder. AR 200.

On June 18, Mathis told a MetLife claim manager she had experienced a seizure with a half dose of Zoloft, she had tolerated Wellbutrin, and she refused to take psychotropic medications. AR 593, 600.

On June 22, Mathis sought treatment from Gloria McKelvey, L.M.H.C., with Ron Cipriano & Associates Counseling for "trauma issues, mental abuse from 3 kids, [and] trouble functioning on a daily basis." AR 427. A report of a mental status examination detailed normal findings except for an anxious and depressed mood and a blunted and irritable affect. AR 432, 434. McKelvey diagnosed Mathis with major depression–single episode and generalized anxiety disorder and recommended counseling thrice weekly. AR 433. Mathis returned to McKelvey on June 23, 24, 29, and 30 and July 1, 6, and 7. AR 441. There are few notes from each visit, and the handwriting makes them difficult to decipher. *See* AR 441.

On August 25, Dr. Gross prepared a "behavioral health supplemental functional assessment form." AR 349–50. He stated Mathis "continues to experience significant anxiety and depression which further exacerbate her difficulties with thought organization." AR 349. He checked a box indicating he had reviewed her job description. AR 350. He opined her problems would reduce task efficiency, error detection, ability to follow complex instructions, ability to manage interpersonal interactions with coworkers, and ability to manage stress. AR 349. He opined she could not return to work full-time pending remediation of her problems—"4–6

months"—but could try to work part-time with limits. AR 349. He suggested providing her a reduced workload; allowing her to work only 20 hours a week; limiting her exposure to conflict; and giving her simple, straightforward instructions. AR 349.

On August 28, Mathis saw Susan Armour, A.R.N.P., with the Center for a Healthy Mind and Wellbeing. AR 241–45, 638. This was the first of many visits to the center. *See* AR 78–98, 225–45, 307–12. The record of each visit uses mostly the same format and often repeats information from the previous report: encounter date, personal identification information, chief complaint, medications, allergies, past medical history, surgical history, family history, social history, vitals, history of present illness, review of systems, physical exam, mental status exam, psychiatric history, side effects, suicide risk assessment, violent risk assessment, assessment/plan, discussion notes, return date, quality management, and measures. AR 78–98, 225–45. These statements appear in the record of the first visit and one or both are repeated in the records of all later visits: "Patient has been compliant with medications and denies side effects with current medications," and, "The patient denies any recent substance use and continues to be compliant with all psychotropic medications and does not report any major side effects from them." AR 79, 81, 84, 88, 91, 94, 97, 226, 227, 230, 231, 234, 237, 240, 244. This statement also appears in the record of the first visit and is repeated in the records of all later visits: "At this time, the patient is stable to continue with the outpatient management of their symptoms." AR 79, 81, 84, 88, 91, 94, 97, 227, 231, 234, 237, 240, 244.

During the August 28 visit with Armour, Mathis reported that she had experienced side effects with three medications for depression but wanted something to treat ADHD. AR 244. Armour observed Mathis was "very overly dramatic[] and appears to have difficulty making decisions." AR 244. Armour prescribed Brintellix. AR 242.

On September 10, Mathis saw Armour. AR 238–41. Mathis had stopped taking the Brintellix, feeling it was "mixed." AR 240. Armour noted Mathis "has read every potential side effect that is possible for any meds she would like to take[] and feels

she will have those side effects if she tries those meds." AR 240. That statement is repeated in the records of several later visits. AR 90, 94, 231, 234, 236. Armour noted Mathis was, "[v]ery resistive to treatment, was told that if meds were not what she wanted at this time that she was welcome to come back when she did want them." AR 240. Armour gave her samples of Viibryd. AR 240.

On September 28, McKelvey completed an "attending physician's return to work report." AR 326–28. McKelvey opined Mathis was "making progress" but "has regressed since return to work" on September 14 and cannot return to work for an unknown length of time. AR 327.

### 2.    *During the Period at Issue (September 29 to November 4, 2015)*

Mathis saw McKelvey again on September 29 and 30; October 5, 7, 13, 14, 19, 20, 21, 27, and 28; and November 2, and 3. AR 110–11, 120–21, 318–23. Again, there are few notes from each visit, and the handwriting makes them difficult to decipher. *See* AR 110–11, 318–23. There are "treatment session summary notes" for September 29 and 30 and October 5, 7, 13, 14, 20, and 21; they indicate fair or good stabilization. AR 120–21, 319–23.

During an October 14 conversation with a MetLife claim manager, Mathis stated she was sensitive to medication; she was "weary" about taking medication because she sometimes has a "strong reaction" and it can be "hit or miss"; she had had to cease taking Brintellix because it worsened her anxiety; she had not taken the Viibryd because she was doing better before returning to work; Armour had told her "then don't take it"; and she was taking no medication. AR 658–59.

On October 16, Mathis saw Armour. AR 235–38. Armour conducted no mental status exam. *See generally* AR 235–38. Armour repeated Mathis was, "[v]ery resistive to treatment, was told that if meds were not what she wanted at this time that she was welcome to come back when she did want them." AR 236. Armour noted Mathis had not taken the Viibryd, and Armour started her on Vayarin. AR 236–37.

8

On October 26, Mathis began seeing Cecilia Langford, A.R.N.P., with the Center for a Healthy Mind and Wellbeing instead of Armour. AR 232–35. Langford conducted a mental status exam and detailed the observations:

> Appearance: adequately groomed, normal weight, and average build. Behavior: calm, eye contact good, and **guarded**. Speech: normal volume and rate and fluent, clear, and nonpressured. Mood: euthymic. Affect: appropriate, mood congruent, and **apathetic**. Thought Processes: intact, linear, logical, and goal-oriented. Thought Content: Patient did not endorse any suicidal ideations and homicidal ideations. Perception: negative [for] illusions, visual hallucinations, and auditory hallucinations. Cognition/Sensorium/Intellect: oriented to situation, time, place, and person; intact immediate recall, remote memory, and recent memory; and alert, awake, memory intact, and average intellect. Motor Activity: intact. Insight: **questionable**. Judgment: **questionable**. Impulse Control: **questionable**.

AR 233 (emphasis in original). Langford noted Mathis is "[r]ealizing she needs to take something to function more effectively"; is "very disorganized and overwhelmed"; had not taken the Viibryd; had started the Vayarin but could not fill the prescriptions at pharmacies she tried; and was instructed to start the Viibryd because "outcomes reported were supportive of decreased anxiety and increased cognitive improvement." AR 234. Langford gave her samples of Vayarin. AR 234.

On October 28, McKelvey completed another "attending physician's return to work report." AR 117–19. McKelvey stated Mathis had tried to return to work but work demands had caused increased depression and anxiety, and panic attacks and disturbed sleep had returned. AR 118. McKelvey opined Mathis's prognosis was "guarded to poor" and she has been unable to work from May 5 to September 14 and September 29 "to present." AR 118–19. On the same day, McKelvey also completed a "certificate of ongoing illness or injury." AR 116. Next to "Diagnosis and Concurrent Conditions," McKelvey wrote, "Client's depression has decreased to moderate, however her anxiety remains very high." AR 116.

In an undated letter to a MetLife claim manager, Mathis wrote, "[A]fter 2 successful weeks on Vayarin for ADHD (started 10/17 with no noticeable negative

side effects) I requested to try Viibryd again for depression as I was still struggling with extreme anxiety + bouts of depression. We are evaluating my response to it (started 10/27/15)." AR 301–03.

3.    *After the Period at Issue (November 5, 2015, to September 9, 2016)*

On November 9, Mathis saw Langford, who repeated her assessment notes from the October 26 visit. AR 228–32.

Mathis continued to see McKelvey. *See* AR 109–10 (records indicating visits on November 10, December 8 and 14, January 4, February 1, and June 18 and 28). Again, there are few notes from each visit, and the handwriting makes them difficult to decipher. *See* AR 109–10.

On November 11, Mathis conveyed to a MetLife claim manager that she was having "wonderful responses" to Vayarin and did not want to "do two new things at one time" (possible referring to not wanting to take Viibryd and Vayarin at the same time). AR 674.

On November 19, Mathis saw Langford. AR 225–28. Langford noted Mathis "continues to present anxious with very little change from last visit. Will continue [Viibryd] for mood symptoms and anxiety." AR 227.

On November 30, Langford completed an "initial functional assessment form." AR 217–21. She checked a box indicating she had not reviewed Mathis's job description. AR 219. Her treatment plan comprised "medication management every 4–6 weeks or as needed." AR 217. She noted Mathis "prefers naturalistic/homeopathic treatments" but is trying medication. AR 217. She opined the symptoms prohibiting Mathis from working were anxiety associated with PTSD and lack of focus and concentration associated with ADHD. AR 218. She opined Mathis would need more time to finish tasks and a quiet zone with no interruptions and that, during a normal workday, her impairments significantly limited her ability to maintain appropriate control of her emotions and maintain focus, attention, and concentration. AR 218–19.

10

On December 9, Mathis saw Langford. AR 95–98. Langford again noted Mathis "continues to present anxious with very little change from last visit. Will continue [Viibryd] for mood symptoms and anxiety." AR 97.

On the same day, McKelvey wrote a letter stating Mathis's "depression and anxiety appeared to increase shortly after she began working again. She appeared to have impaired concentration, poor attention span and poor short term memory. At this point [her] anxiety appears to be chronic and not responding well to treatment." AR 112. McKelvey continued, "It appears that currently she is unable to function in a work like [sic] setting. Her anxiety appears to get in the way of performing complex assignments." AR 112. She opined Mathis "is currently unable to work due to her medical/psychiatric conditions." AR 112.

In a December 14 letter to MetLife, Mathis explained returning to work had been "too soon" and "too much" and, "I do not wish pills, I wish for HEALING, for guidance, and for HELP. Pills do NOT produce SKILLS." AR 191, 193 (emphasis in original).

To decide the claim for the period at issue (September 29 to November 4), MetLife obtained a "physician consultant review" by Lawrence Erlich, M.D., dated December 15. AR 165–69. Dr. Erlich is a "Distinguished Life Fellow" of the American Psychiatric Association and is board certified in psychiatry, addiction psychiatry, and forensic psychiatry. AR 169.

Dr. Erlich set forth Mathis's date of birth, employer, and job title; the records he had reviewed; summaries of the records he had reviewed; and his opinions. AR 165–69. To the question, "Does the medical information support functional limitations (physical or psychiatric) beyond CED [claim end date] through STD [short-term disability] max Duration," he opined:

No.

> The medical information does not support functional limitations beyond the claim end date through the short term disability maximum duration. The claimant was noted to be making progress in EMDR therapy, but she reportedly regressed when she returned to work. The claimant's report of severe psychiatric symptomatology is not supported by the observed information in the provided medical records. The claimant was reported to be resistant to treatment, and she was noncompliant with medication instructions. Ms. Armour noted [she] did not take the Viibryd that was prescribed. As of 10/26/2015, Ms. Langford noted that the claimant was guarded and apathetic, but her GAF [Global Assessment of Functioning] was 60, which indicates moderate symptomology but not symptomology of a severity to preclude occupational functioning. The claimant was again noted to be noncompliant with medication. Ms. McKelvey indicated on 10/28/2015 that the claimant's depression had improved, but her anxiety was severe. This information again reflects claimant's self-report, and there is no evidence of mental status abnormalities or observed symptomatology in the information provided.

AR 168–69. To the question, "Was the claimant receiving appropriate care and treatment for the time specified," he opined yes. AR 169. To the question, "Was the claimant compliant with treatment," and directive, "If no, please indicate why not," he opined, "No. The claimant was not compliant with treatment. The claimant was noted to be resistant to treatment. She did not follow medication instructions on multiple occasions." AR 169. To the question, "Are the current symptoms identified in the medical [sic] severe enough to functionally impair the employee from performing sedentary job duties," he opined, "No. The current symptoms are not a severity to functionally impair the claimant from performing sedentary job duties." AR 169.

On December 18, MetLife faxed Dr. Erlich's report to Langford and McKelvey and requested comments. AR 128, 164, 172, 709. MetLife received no response. AR 128, 709–10.

In MetLife's January 8 denial of Mathis's claim for benefits for the period at issue (September 29 to November 4, 2015), MetLife found she "no longer satisfy[ies] the definition of disability" in the Plan "based on a review of all the documentation in [her] file." AR 133. MetLife set forth the Plan's definition of "disabled" or "disability,"

the job description for a CSX software engineer, and the records it had reviewed. AR 133. MetLife explained it had asked an independent physician consultant (Dr. Erlich) to review the records and restated Dr. Erlich's opinion on whether "the medical information support functional limitations (physical or psychiatric)" beyond the claim end date through the maximum duration of benefits. AR 134; *see* AR 168–69. MetLife informed her that, to consider an extension of benefits, it would "need detailed clinical information documenting the nature and severity of symptoms preventing [her] from performing [her] normal and customary job duties as a software engineer." AR 134.

Mathis saw Langford on January 7, February 4 and 23, and March 15, and Marcus de Carvalho, M.D., also with the Center for a Healthy Mind and Wellbeing, on June 16 and 23.[4] AR 78–95. For the January 7 visit, Langford noted Mathis has had "difficulty with many prescription trials due to side effects of sensitivity." AR 93. Langford indicated Mathis would "retry medications at lower dose and work slowly upward." AR 93. For the February 4 visit, Langford noted Mathis had taken the Viibryd but, even at a lower dose, it was causing "irritability and nerve reactions." AR 90. For the February 23 visit, Langford noted Mathis had started Wellbutrin but had stopped because it was overstimulating. AR 87. For the June 23 visit, Dr. de Carvalho noted Mathis "decided that she would like to start individual therapy and hold off on medication management due to side effects from psychotropics." AR 79.

On July 22, Langford and Dr. de Carvalho completed a "mental medical source statement." AR 74–77. They checked boxes indicating symptoms of decreased energy, feelings of guilt or worthlessness, somatization unexplained by organic disturbance, mood disturbance, persistent disturbances of mood or affect, apprehensive expectation, intense and unstable interpersonal relationships, and impulsive and damaging behavior. AR 74. They opined Mathis could perform or would have

---

[4]MetLife contends Mathis saw Dr. de Carvalho only once, on June 23, Doc. 13 at 10, but the record of the June 16 visit likewise indicates the visit was "performed and documented" by Dr. de Carvalho. AR 83.

noticeable difficulty less than 10 percent of the workday performing most mental aptitudes and abilities for unskilled, semi-skilled, skilled, and other work. AR 75–76.

On June 28, McKelvey completed a "mental medical source statement." AR 105–08. By checking boxes, she identified symptoms of anhedonia, decreased energy, fleeting suicidal thoughts, feelings of worthlessness or guilt, ADHD, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of moot or affect, emotional lability, easy distraction, and emotional withdrawal or isolation. AR 105–06. She opined Mathis would have noticeable difficulty performing or could not perform many abilities and aptitudes for unskilled and semi-skilled work. AR 106–07. Next to the question, "Within a reasonable degree of medical certainty, have the above limitations existed to the relatively same degree of severity since September 13, 2015," she marked "yes." AR 108.

With her July 5 appeal from the denial of benefits, Mathis submitted additional records, including a July 5 affidavit of McKelvey. AR 73, 99, 100, 104. McKelvey stated that when she had started treating Mathis in June 2015, her initial impression was that she suffered from major depressive disorder and anxiety. AR 100. She stated Mathis had shown "some improvement when she was out of work," but her return to work in September 2015 had escalated symptoms of depression and anxiety. AR 100. She opined, "I do not believe that Ms. Mathis, either currently or as of May 7, 2015, could return to her previous occupation (or in fact even an unskilled occupation) on a regular, consistent and reliable basis. She continues to experience significant symptoms of depression and anxiety[,] and while she saw some improvements in her symptoms prior to her return to work in September, her symptoms ultimately worsened." AR 101. McKelvey continued, "She must become more stable before she can return to work and that work most likely will need to be simple, rote and repetitive. At this time though any return to work will cause her to fall apart quickly." AR 101.

To decide the appeal, MetLife obtained a "physician consultant review" dated August 12, 2016, by Joel Becker, Ph.D., a clinical neuropsychologist. AR 33–41.

14

Dr. Becker set forth Mathis's date of birth, employer, and job title; the primary diagnoses; a background; the records he had reviewed, including a "detailed job description"; the phone calls he had made to providers to talk to them; the purpose of his review ("The review focused upon the neurocognitive and psychiatric aspects of the claimant's functional status"); her mental health history, her "[p]ertinent" medical history; a review of neuropsychological evaluation results; and his opinions. AR 33–41. Dr. Becker stated Mathis "has been receiving mental health treatment" since she last worked in May 2015 and "does have a history of mental health challenges including cognitive/learning challenges as evidenced by a diagnosis of ADHD." AR 34. Dr. Becker stated Mathis's record "does not contain a history or presence of remarkable medical disorders. The medical history was reviewed with a degree of brevity since the focus of this IPR is on the Psychiatric and Neurocognitive aspects of the claimant's functioning." AR 35.

To the question, "Does the medical information support [c]ognitive functional limitations for the time period 9/13/15–11/4/15," he opined, "No. A detailed review of the medical record and all associated claim documentation did not produce objective data/facts supporting a diagnosis of neurocognitive disorder." AR 38. He detailed and commented on results of tests from Dr. Gross's June 15 neuropsychological evaluation of Mathis indicating no neurocognitive disorder and results within a normal range in most areas (sensory-motor, grip strength, visual, attention, language communication, intellectual functioning, learning and memory, and reasoning and executive functioning). AR 35–37, 39. For the area "attention," he opined the test was "not an accurate reflection of [her] potential functioning" because of a significant variance between results for visual attention and auditory attention. AR 39. For the area "emotional/personality," he stated, "Results … were accentuated for a number of characteristics including self-debasement. Clinical scales were elevated for depression, avoidant, dependent, masochism, anxiety, dysthymia, posttraumatic stress, major depression, and trends for thought disorder, [and] somatoform disorder …. It is noted that the examinee may [have] a tendency to over-endorse items

15

pertaining to difficulties in the emotional and interpersonal domains." AR 39. He concluded:

> [T]here is no supporting evidence for an existing neurocognitive disorder diagnosis. Cognitive fluctuations as found in the profile produced upon testing as described are variations that can be found in the general population.
>
> There is no medical evidence of neurological pathology or a degenerative condition affecting the central nervous system. There were no diagnostic imaging studies or biomarker studies in the medical record.
>
> Any cognitive presented complaints are not considered functionally impairing based upon this review. Therefore, it is the clinical opinion of this IPC [independent physician consultant]… that the claimant did not manifest cognitive functional limitations from the period of September 13, 2015 through November 4, 2015 that would prevent her from being able to be gainfully employed.

AR 39.

To the question, "Does the medical information support [p]sychiatric functional limitations for the time period 9/13/15–11/4/15," Dr. Becker opined:

> No. The claimant has been maintained with phases of treatment with psychotropic medication and periods of time where she has chosen not to be treated second pharmacologically due to personal choice and avoid side effects. In addition the claimant has had phases of psychotherapy treatment for her several diagnosed mental conditions.
>
> Specific excerpts from the text of this review … are repeated here with IPC comments. On a Mental Medical Source Statement date stamped July 27, 2016 the following was noted: Frequency of contact was two to three months with duration at 15 minutes. The form was signed by the treating nurse practitioner and the psychiatric physician.
>
> The office visit notes of Dr. [de Carvalho] were reviewed. On June 23, 2016 the treating psychiatrist notes that the claimant was not taking psychotropic medication and that she was amenable to psychotherapeutic consultations. It was also noted that "at this time the patient is stable to continue with the outpatient treatment of her symptoms." The treating psychiatrist also noted that the claimant was not able to return to work due to her mood and affective … state.

16

Notes from the claimant's treating psychotherapist indicate inability to return to work presently. However, the diagnoses, autonomous functioning of the claimant, frequency of therapeutic sessions, decisions regarding pharmacological treatment, and overall psychiatric stability currently lead to the conclusion the claimant does not manifest symptoms and functional limitations that would prevent RTW [return to work].

In conclusion it is noted that the claimant does have several psychiatric diagnoses that are currently being treated. Based on the treatment plan of her providers, the claimant is being maintained in a stable manner on an outpatient basis.

The claimant's conditions have been present for a number of years some of which date back to childhood. It is the clinical opinion of this IPC, that the diagnosed conditions are not of a level of intensity and symptomatology that would prevent her from being gainfully employed.

The claimant would benefit from ongoing outpatient treatment while concomitantly returning to work and in sustaining ability to work.

Lastly, given the duration of time since the claimant has worked on a full-time basis, a gradual phased-in RTW may be helpful. A consideration could be two weeks of four[-]hour days, two weeks of six-hour days, and after one month return to a full-time 40 hours per week schedule.

AR 40–41.

In MetLife's September 9 decision upholding the initial denial of the claim, MetLife found Mathis had not satisfied "the Plan's definition of Disability" and had not demonstrated "she was unable to perform her own occupation as of September 29, 2015 through November 4, 2015." AR 26. MetLife stated it had reviewed the "entire claim file" and "carefully reviewed" all information concerning the claim, including information received before and after the initial decision. AR 27. MetLife set forth the Plan's definition of "disabled" or "disability," the job description for a CSX software engineer, and her diagnoses, and observed that she had been out of work since May 2, 2015, except for a return to work from September 14 to 28, 2015. AR 26–27. MetLife continued:

> In an effort to ensure all medical documentation was considered, we faxed [Dr. Becker's] report to Mr. Ron Cipriano, Ms. Gloria Suzanne McKelvey, Ms. Cecilia Langford and Ms. Stephanie Billman. We requested that they review [Dr. Becker's] report and provide any documentation or rationale regarding your inability to work that they felt would be pertinent to your appeal …. You were notified by telephone and letter that this was taking place. To date no additional documentation has been received. Ms. Stephanie Billman contacted MetLife and stated that she would not be responding to [Dr. Becker's] report as she treated your client from May 7, 2015 through June 19, 2015, which was outside the scope of this review.

AR 29. MetLife concluded,

> We have completed a review of all the medical information on file, and based on our review, which included the recommendations from [Dr. Becker], it was determined the medical documentation contained in your client's file failed to provide clinical evidence in support of a psychiatric functional impairment that would have precluded her from performing her occupation, as a Software Engineer, as of September 29, 2015 through November 4, 2015, the STD maximum duration date. Therefore, in accordance with the Plan's definition of disability, the decision to deny … recurrent STD benefits was appropriate and remains in effect.

AR 29.

## II.   Law and Analysis

A participant of a plan governed by ERISA may bring a civil action "to recover benefits due to [her] under the terms of [her] plan," 29 U.S.C. § 1132(a)(1)(B), after exhausting available administrative remedies under the plan. *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1314 (11th Cir. 2016). A participant suing to recover benefits must prove entitlement to the benefits. *Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008).

A court reviews a plan administrator's final decision. *Till v. Nat'l Life Ins. Co.*, 678 F. App'x 805, 808 n.2 (11th Cir. 2017); *Niebauer v. Crane & Co.*, 783 F.3d 914, 926 (1st Cir. 2015); *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016); *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d

946, 952 (8th Cir. 2010). Focusing elsewhere "would be inconsistent with ERISA's exhaustion requirement," though a plan administrator's initial decision may inform a court's review of the final decision as evidence of the decision-making process; "it may be that questionable aspects of or inconsistencies among … pre-final decisions will prove significant in determining whether a plan administrator abused its discretion." *Funk*, 648 F.3d at 191 n.11.

To evaluate a plan administrator's decision, the Eleventh Circuit has established a six-step test:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Met. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).[5]

---

[5]"In an ERISA benefit denial case … the district court sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat'l Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (unpublished) (quoted authority omitted). The standard of review "does not neatly fit" under Rule 52 or Rule 56, *Wilkins v. Baptist*

Mathis concedes MetLife is vested with discretion in reviewing the claims (step two) and does not operate under a conflict of interest (steps four through six).[6] Doc. 15 at 4. To further judicial economy, the Court may forgo de novo review (step one) and proceed to the easier issue of whether MetLife's decision is arbitrary and capricious (step three).[7]

"In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship*, 644 F.3d at 1355 n.5. "A decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision." *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997). If a reasonable basis exists for the decision, it "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008). In applying the arbitrary-and-capricious standard, a court is limited to "the facts as known to the administrator at the time the decision was made." *Glazer,* 524 F.3d at 1246 (internal quotation marks omitted).

A court may not require a plan administrator to automatically "accord special weight to the opinions of a claimant's physician" or impose on a plan administrator a "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S.

---

*Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998), which are "nothing more than vehicles for teeing up ERISA cases for decision on the administrative record," *Stephanie C. v. BCBS of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 n.2 (1st Cir. 2016). Here, because the parties agree there are no factual issues, the Court should limit its review to the administrative record, the arbitrary-and-capricious standard applies, and the Court should enter judgment in favor of one party or the other without further proceedings, the Court does not need to decide which rule is the more appropriate one under which to enter judgment.

[6]"A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Blankenship*, 644 F.3d at 1355. Here, it is undisputed that MetLife determines eligibility but provides no funding. *See* AR 2, 6, 18.

[7]To further judicial economy, the Eleventh Circuit sometimes starts at the third step. *See, e.g., Till*, 678 F. App'x at 808; *Braden v. Aetna Life Ins. Co.*, 597 F. App'x 562, 566 n.2 (11th Cir. 2014).

822, 834 (2003). "Giving more weight to the opinions of some experts than to the opinions of other experts is not an arbitrary or capricious practice." *Slomcenski v. Citibank, N.A.,* 432 F.3d 1271, 1279–80 (11th Cir. 2005). A plan administrator may deny a claim "on the basis of conflicting, reliable evidence." *Oates v. Walgreen Co.*, 573 F. App'x 897, 910 (11th Cir. 2014) (quoted authority omitted).[8]

Payment of benefits during a previous period is not necessarily relevant to whether its decision on a later period is arbitrary and capricious. *See Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 265 (11th Cir. 2007) ("[The claimant] … argues that MetLife's payment of disability benefits for nearly two years should weigh against its decision to discontinue benefits. We have never held that such a fact is a relevant consideration when we review the denial of benefits under ERISA.").

Here, considering only the evidence before MetLife, MetLife's final decision to deny Mathis benefits for the period at issue (September 29 to November 4, 2015) is not arbitrary and capricious because a reasonable basis supports it: MetLife's review of the record and MetLife's consideration of the Plan's definition of "disabled" or "disability," the job description for a CSX software engineer, her diagnoses, and the opinions of an independent psychologist—Dr. Becker—rendered after his own review of the record and without rebuttal by her treating providers after an opportunity to

---

[8]See, for example, *Blankenship*, 644 F.3d at 1356 ("Given … conflicting reports and the absence of persuasive evidence that MetLife conducted an unfair review …, we cannot conclude that MetLife was unreasonable in crediting the medical advice of the independent doctors over the opinions of Blankenship's doctors and in concluding that Blankenship failed to provide 'conclusive medical evidence of Disability.'"); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997) ("[To resolve conflicting opinions,] the … Committee sought evaluations from … other physicians …. Although [their] medical evaluations … contained sporadic, internally inconsistent statements concerning … the degree to which Paramore suffered from a physiological—rather than stress-related condition and the degree to which she [could return] to work …, the … Committee's function was to evaluate the various reports in tandem and render a determination …. We cannot say [its] appraisal of the available medical information was unreasonable or inconsistent with the data"); and *Oates*, 573 F. App'x at 910 ("[The plan administrator] had conflicting evidence …, and evidence tending to establish that [the participant] was able to perform sedentary work was not obviously unreliable. … [The plan administrator] was permitted to deny … benefits on the basis of this evidence.").

provide rebuttal. *See* AR 33–41 (Dr. Becker's report); AR 27–30 (MetLife's final decision). MetLife had no obligation to defer to the opinions of Mathis's treating providers or explain why it favored other opinions to the extent they were inconsistent. *See Black & Decker*, 538 U.S. at 834.

Mathis argues MetLife's final decision to deny her benefits for the period at issue is arbitrary and capricious because MetLife uncritically relied on Dr. Becker's opinions and those opinions are flawed. *See generally* Docs. 15, 17.

To support the argument, Mathis contends MetLife did not acknowledge an opinion Dr. Becker rendered that would support a disability determination, pointing to this opinion in his August 12, 2016, report: "[G]iven the duration of time since [she] has worked on a full-time basis, a gradual phased-in RTW may be helpful. A consideration could be two weeks of four[-]hour days, two weeks of six-hour days, and after one month return to a full-time 40 hours per week schedule." Doc. 15 at 16–17; Doc. 17 at 4; *see* AR 41 (Dr. Becker's opinion). Mathis's contention fails. Dr. Becker's August 12, 2016, opinion that Mathis would need a gradual and limited return to work because she has not worked since May 1, 2015, does not support that she had been disabled from September 29 to November 4, 2015.

Mathis contends Dr. Becker's opinion that she had had no functional limitations on her ability to work during the period at issue is conclusory, unreasonable, and without support. Doc. 15 at 21–24; Doc. 17 at 3, 9. Mathis's contention fails. Dr. Becker explained Mathis's record "does not contain a history or presence of remarkable medical disorders." AR 35. Mathis does not argue otherwise. Dr. Becker explained Dr. Gross's June 15 neuropsychological evaluation indicated mostly normal findings and there was no support for a neurocognitive disorder, neurological pathology, or degenerative condition affecting the central nervous system. AR 38–39. Mathis does not argue otherwise. Dr. Becker explained he did not consider the complaints she presented "functionally impairing" and the diagnosed conditions are not of a level of intensity and symptomatology that would prevent her from being gainfully employed. AR 39. She argues the explanations are conclusory or

22

generic, Doc. 15 at 22–23, but Dr. Becker provided them not by themselves but in a detailed report, *see* AR 33–41. Dr. Becker explained she has several diagnosed mental conditions but has been maintained and treated for them. AR 40–41. She argues that explanation disregards that she was never stable and never got better, Doc. 15 at 23, but that argument does not consider the limited period at issue—September 29 to November 4, 2015—during which Armour and Langford noted she was stable and able to continue with outpatient management of symptoms and recorded mostly normal findings from a mental status examination, *see* AR 234, 237, and McKelvey noted fair or good stabilization in the "treatment session summary notes," *see* AR 120, 319–23.

Mathis contends there is no support for Dr. Becker's statement, "Notes from the claimant's treating psychotherapist indicate inability to return to work presently. However, the diagnoses, autonomous functioning of the claimant, frequency of therapeutic sessions, decisions regarding pharmacological treatment, and overall psychiatric stability currently lead to the conclusion the claimant does not manifest symptoms and functional limitations that would prevent RTW [return to work]." Doc. 15 at 23 (quoting AR 40). Mathis points to evidence that—during the period at issue— she had difficulty functioning and obtained treatment more than a dozen times. Doc. 15 at 23. Mathis's contention fails. Dr. Becker's reference in a nearby paragraph to the July 27, 2016, mental source statement describing 15-minute visits every two to three months, his opinions on transitioning back to work in a nearby paragraph, and his use of "presently," make clear that opinion concerned Mathis's ability to return to work, not her ability to work during the period at issue.

Mathis contends Dr. Becker was "mistaken" in finding she was not compliant with prescribed treatment. Doc. 17 at 7–8. Mathis's contention fails. Dr. Becker stated, "The claimant has been maintained with phases of treatment with psychotropic medication and periods of time where she has chosen not to be treated second [sic] pharmacologically due to personal choice and [to] avoid side effects." AR 40. The record amply supports that statement. *See* AR 500 (May 21, 2015; Billman's

statement Mathis does not want to take psychotropic medicine because she had reacted badly to medicine in the past); AR 467 (June 10, 2015; Billman's statement Mathis "refuses to take psychotropic medications because in the past these medications have had bad side effects"); AR 593, 600 (June 16, 2015; Mathis's statement that she experienced a seizure with a half dose of Zoloft, tolerates Wellbutrin, and refuses to take psychotropic medications); AR 244 (August 28, 2015; Armour's statement that Mathis reports having experienced side effects with three medications for depression); AR 240 (September 10, 2015; Armour's statement that Mathis stopped taking Brintellix and "has read every potential side effect that is possible for any meds she would like to take[] and feels she will have those side effects if she tries those meds"; repeated in records of later visits, AR 90, 94, 231, 234, 236); AR 240 (September 10, 2015; Armour's statement that Mathis is "[v]ery resistive to treatment, was told that if meds were not what she wanted at this time that she was welcome to come back when she did want them"); AR 658 (October 14, 2015; Mathis's statement she was sensitive to medication; she was "weary" about taking medication because she sometimes has a "strong reaction" to it and it can be "hit or miss"; she had had to cease taking Brintellix because it worsened her anxiety; she had not taken the Viibryd given to her because she was doing better before returning to work; Armour had told her "then don't take it"; and she was taking no medication); AR 236 (October 16, 2015; Armour's repeated statement that Mathis is "[v]ery resistive to treatment, was told that if meds were not what she wanted at this time that she was welcome to come back when she did want them" and that Mathis had not taken the Viibryd given to her); AR 234 (October 26, 2015; Langford's statement that Mathis is "[r]ealizing she needs to take something to function more effectively," had not taken the Viibryd, had started the Vayarin but could not fill the prescriptions at the pharmacies she tried, and was instructed to start the Viibryd because "outcomes reported were supportive of decreased anxiety and increased cognitive improvement"; repeated in at least one record of a later visit, AR 231); AR 674 (November 11, 2015; Mathis's statement she was having "wonderful responses" to Vayarin and did not want to "do two new things at one time"); AR 191 (December 14, 2015; Mathis's letter

stating, "I do not wish pills, I wish for HEALING, for guidance, and for HELP. Pills do NOT produce SKILLS"); AR 93 (January 7, 2016; Langford's statement that Mathis has had "difficulty with many prescription trials due to side effects of sensitivity"); AR 90 (February 4, 2016; Langford's statement Mathis has taken the Viibryd but even at a lower dose, it was causing "irritability and nerve reactions"); AR 87 (February 23, 2016; Langford's statement Mathis has started Wellbutrin but had stopped because it was overstimulating); AR 79 (June 23, 2016; Dr. de Carvalho's statement that Mathis "decided that she would like to start individual therapy and hold off on medication management due to side effects from psychotropics"). Mathis points to a statement she has complied with psychotropic medications in reports of visits to the Center for a Healthy Mind and Wellbeing where Armour, Langford, and Dr. de Carvalho work, but that statement is repeated in every report of every visit there from the outset, AR 79, 81, 84, 88, 91, 94, 97, 226, 227, 230, 231, 234, 237, 240, 244, and it was not unreasonable for Dr. Becker to rely not on that rote statement but on the more specific statements concerning medication compliance.[9]

Mathis complains about aspects of Dr. Erlich's opinions, on which MetLife relied for its initial decision to deny benefits. *Compare* AR 133–34 (initial decision) *with* AR 165–69 (Dr. Erlich's opinions). But the Court's review is of MetLife's final decision, *see Till*, 678 F. App'x at 808 n.2, and Mathis does not contend MetLife's initial decision affected the final decision. To the extent Mathis contends aspects of Dr. Erlich's opinions should inform the Court's review of MetLife's final decision, the contention fails.

---

[9]Although MetLife asked Dr. Becker whether Mathis's impairments caused functional limitations during the period at issue, Dr. Becker's response to the question could be read as relating to a later period and whether she could return to work. Mathis does not contend Becker considered the wrong time period. *See generally* Docs. 15, 17. In any event, the question posed to him referenced the correct period; he reviewed evidence from that period; many of his reasons for finding no functional limitations apply equally to that period; and MetLife stated it had considered all medical evidence and information in Mathis's file in denying benefits.

Mathis argues Dr. Erlich's statements that objective findings do not support her subjective reports and there are no observed mental-status abnormalities are wrong because mental status examinations contain objective findings. Doc. 15 at 19. But evidence in the administrative record when MetLife made the initial decision supports that Mathis's reported symptoms contradicted objective findings. Treatment notes from Langford, Armour, and McKelvey during the period at issue contain limited positive findings on examination. On September 10 (shortly before the period at issue) Armour observed Mathis showed guarded behavior, apathetic affect, and questionable insight, judgment, and impulse control, but she otherwise was calm, made good eye contact, had normal speech, had a euthymic mood, had normal thought processes and content, reported no hallucinations, was oriented to situation, time, place, and person, had no memory deficits, and had intact motor activity. AR 239–40. On October 26, Langford made the same observations. AR 233. On November 9 (shortly after the period at issue), Langford observed Mathis's mood and affect were anxious but otherwise made the same observations. AR 230. Records from McKelvey during the period at issue contain little objective information. *See* AR 110–12, 116–21, 318–23, 327. Dr. Erlich reasonably characterized those findings as inconsistent with Mathis's complaints of debilitating symptoms, and MetLife reasonably relied on that assessment.

Mathis points to Armour's examination findings from August 28, 2015. Doc. 15 at 19 (citing AR 243–44). But Mathis was considered disabled at the time of that office visit. A day earlier, MetLife had extended her short-term disability benefits through mid-September. AR 338. Whether she was disabled by that date is not in dispute. She points to no other objective evidence from the period at issue before MetLife when it relied on Dr. Erlich's opinion.[10]

---

[10]In June and July 2016, McKelvey provided opinions concerning her objective findings during the period at issue. AR 100–01, 105–08. Those records were not before Dr. Erlich when he provided his opinion in December 2015 or MetLife when it made the initial decision in reliance on Dr. Erlich's opinion in January 2016. The only documents from McKelvey in the administrative record at the time were the brief handwritten

Dr. Erlich's statement that "there is no evidence of mental status abnormalities or observed symptomatology in the information provided" appears directed only to the "certificate of ongoing illness or injury" completed by McKelvey on October 28, in which she wrote, "Client's depression has decreased to moderate, however her anxiety remains very high," AR 116. *See* AR 169. Dr. Erlich mentioned that notation, described it as reflecting Mathis's "self-report," and observed there was "no evidence of mental status abnormalities or observed symptomatology." AR 169. He did not make a blanket statement that no provider had ever documented mental-status abnormalities during the period at issue. In summarizing the medical evidence he had reviewed, Dr. Erlich specifically mentioned positive mental-status findings. *See* AR 166–68.

The limited objective evidence in the record also provides support for Dr. Erlich's finding that Mathis had no functional limitations. At a minimum, Dr. Erlich's finding was not so obviously lacking in evidentiary support that MetLife acted arbitrarily and capriciously in not second-guessing his opinion.

Mathis argues MetLife unreasonably relied on Dr. Erlich's opinions because MetLife had asked whether Mathis could perform sedentary work—a consideration irrelevant to Mathis's assertion that mental limitations impaired her ability to perform her highly skilled job. Doc. 15 at 20–21; Doc. 17 at 2–3, 9. Though Mathis is correct MetLife asked Dr. Erlich whether Mathis could perform sedentary work, it also asked whether the medical information supported "physical or psychiatric functional limitations." AR 168. He opined it did not. AR 168. His report also clarifies he knew of the mentally demanding nature of her work because he recognized she was employed as a software engineer. AR 165.

---

session summaries and a December 2015 letter indicating Mathis had impaired concentration and poor attention span and short-term memory. In any event, the objective findings she identified in those later opinions are not so inconsistent with Dr. Erlich's statements that they would compel a different opinion.

With no showing that MetLife's decision was arbitrary and capricious, affirmance is warranted.

## III.    Recommendations[11]

I recommend affirming the decisions denying the claim for benefits; directing the Clerk of Court to enter judgment for CSX Corporation Short Term Disability Plan and against Kathleen Mathis; and directing the Clerk of Court to close the file.

**Entered** in Jacksonville, Florida, on January 25, 2018.

_____
Patricia D. Barksdale
*United States Magistrate Judge*

c:    The Honorable Timothy J. Corrigan
      Counsel of record

---

[11]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the district judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.